UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| SPRINT NEXTEL CORPORATION and SPRINT COMMUNICATIONS COMPANY, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 4:13CV01292 AGF |
| JAMIE D. YOAK, | ) ) | |
| Defendant. | ) ) | |

## **MEMORANDUM AND ORDER**

This matter is before the Court following an evidentiary hearing on the motion (Doc. No. 52) of Plaintiffs Sprint Nextel Corporation and Sprint Communications Company (hereinafter referred to jointly as "Sprint"), for a finding of civil contempt and imposition of sanctions against Defendant Jamie Yoak for violating the permanent injunction entered in this case on October 25, 2013. The hearing took place over three days: November 10, 2014; February 24, 2015; and February 25, 2015. The parties have filed post-hearing briefs, and the redacted transcript of the hearing has also been filed. The Court finds that Sprint has proven by clear and convincing evidence that Defendant had notice of the injunction, but has failed to prove by clear and convincing evidence that Defendant violated the specific terms of the injunction. Therefore, the motion for contempt sanctions shall be denied.

## BACKGROUND

Sprint, a wireless telephone carrier, brought this action on July 9, 2013, for damages and injunctive relief, alleging that Defendant willfully infringed Sprint's rights by engaging in illegal business practices involving the unauthorized access and alteration of Sprint's customer accounts, the fraudulent charging of the purchase of mobile devices and related equipment to Sprint's customers' accounts, and the converting and transferring (or "porting") of customers' unique and desirable "vanity"[1] phone numbers for purposes of selling the numbers for profit.

### Permanent Injunction and Procedural Facts

On August 26, 2013, the Clerk's Office of the Court entered default against Defendant. On October 4, 2013, Sprint filed a motion for default judgment as to damages and for a permanent injunction enjoining Defendant from her porting activities, setting forth detailed terms for the requested injunction. (Doc. No. 17.) By Memorandum and Order dated October 25, 2013, the Court granted Sprint's motion for default judgment with respect to liability, and immediately after, in the same document, issued a Permanent Injunction, mirroring the terms requested by Sprint, immediately and permanently enjoining Defendant from:

- a. accessing, altering, changing or modifying any Sprint account without authorization;

- b. purchasing, selling, trafficking, porting, transferring, converting, procuring, interfering with, and/or using, directly or indirectly, any

---

[1] Vanity numbers were described as numbers with repeating digits, such as 888-8888, which customers may find to be commercially valuable.

telephone number of a Sprint customer without the customer's permission;

c. purchasing, selling, trafficking, porting, transferring, converting, and/or interfering with, directly or indirectly, any telephone number provided by any other telecommunications company and porting or attempting to port that number to Sprint;

d. contacting or communicating with Sprint, its customers, or any other telecommunications company for the purpose of, or in any way related to, accessing or altering a Sprint customer's account without authorization, unlawfully porting a telephone number related to a Sprint customer, or otherwise perpetrating a fraud or deception of any kind involving Sprint or a Sprint customer;

e. harassing Sprint or its customers;

f. accessing Sprint's computers through any deceptive means, including but not limited to deceptive statements to Sprint customer service representatives intended to cause them to access Sprint computers, online account access via the internet, and calls to Sprint's telephone automated systems;

g. using or encouraging or permitting others to use false or fraudulent names and/or identities or illegally posing as a Sprint customer in any communications to, with, or regarding Sprint;

h. illegally acquiring, purchasing, transmitting, transporting, transferring, leasing, and/or reselling any Sprint Product (including any product, good, or service manufactured, distributed, sold, or provided to customers or offered for sale by Sprint, including but not limited to Sprint handsets accessories, component parts, activation materials, or other items affiliated with Sprint or bearing a Sprint trademark);

i. making, encouraging, or permitting others to make false representations that Defendant or anyone working with or on her behalf is associated or affiliated in any way with Sprint; and

> j. assisting, encouraging, directing, facilitating, or condoning any other person or entity to engage in any such conduct prohibited by [the] Permanent Injunction.

(Doc. No. 19.)

The Court granted Plaintiffs' request for permission to conduct discovery on the full extent of their damages, and stated that once the damages issue was resolved, the Court would issue a final judgment in the case.

On November 19, 2013, Defendant filed a *pro se* "Motion for More Time for Protective Order," regarding her deposition that Sprint had scheduled for November 18, 2013. Defendant stated that she had let Sprint's attorney know well in advance that she would be unable to attend. On January 3, 2014, Sprint filed a motion for entry of final judgment for damages in the amount of $587,451.82, stating that Sprint decided to forego seeking damages beyond that amount.

On January 8, 2014, Defendant filed a notice of her intent to seek dismissal of the case based on Plaintiffs' failure to serve her. In this filing she stated, "I was not advised in writing or verbally in a way that I reasonably could have known that failing to appear and defend myself would result in a default judgment against me." (Doc. No. 26 at 7.) On February 6, 2014, Defendant filed a motion to dismiss, and on March 5, 2014, she filed another document entitled motion to dismiss in which she stated that Sprint "illegally obtained a judgment against her." (Doc. No. 32 at 2.) April 24, 2014, at the start of the hearing on Defendant's motion to dismiss, the Court handed Defendant a copy

of the Permanent Injunction, in response to Defendant's suggestion that the injunction had not been served on her.

On May 9, 2014, Sprint filed the present motion for contempt/sanctions, asserting that Defendant violated the injunction on March 5, March 9, and April 14, 2014, resulting in a loss of $2,723.35 to Plaintiffs. Sprint asked the Court to hold Defendant in contempt, to award Sprint damages for the consequences of Defendant's conduct, and to incarcerate Defendant as an additional coercive remedy.

On June 26, 2014, the Court denied Defendant's motion to dismiss the underlying case, rejecting Defendant's assertion that the case should be dismissed for lack of proper service. On June 30, 2014, the Court entered Judgment in favor of Plaintiffs for $655,440.42, retaining jurisdiction to enforce the Permanent Injunction. (Doc. No. 86.) Defendant thereafter filed a pro se notice of appeal. (Doc. No. 93.)

August 25, 2014, Defendant, with the assistance of counsel appointed to assist Defendant on the issues related to the present motion for contempt,[2] responded to the contempt motion, asserting that she first learned of the Permanent Injunction at the April 24, 2014 hearing when it was handed to her by the Court, and that since that time, she has not violated it. In the memorandum, counsel states that Defendant has admitted to having knowledge that a default judgment was entered against her in favor of Sprint sometime in early 2014, but that this knowledge was not sufficient to constitute actual knowledge of

---

[2] Defendant had repeatedly expressed a desire to proceed without the assistance of counsel in the underlying case. With respect to the contempt proceeding, however, and at the urging of the Court, Defendant did request the appointment of counsel (Doc. No. 90), and the Court granted that motion on July 3, 2014 (Doc. No. 92).

the Permanent Injunction. The memorandum further stated, "[Defendant] admits to having made several calls to Sprint in March and April of 2014. Most of these calls were made to wrap up outstanding issues on transactions concerning telephone numbers held by Sprint or Assurance Wireless." (Doc. No. 114-1 at 6.) Additionally, Defendant argued that incarceration is unwarranted, and that Sprint's claims for compensatory damages are speculative at best.

On January 26, 2015, Defendant's appeal from the denial of her motion to dismiss the case for lack of service was dismissed by the Eighth Circuit Court of Appeals, for failure to prosecute.

**Evidentiary Hearing**

At the evidentiary hearing on the motion for contempt sanctions, Sprint called two witnesses: Defendant and Clint Breithaupt, a senior fraud manager at Sprint, who had been investigating fraudulent activities by Defendant for the past nine years. Breithaupt testified that on March 5 and April 14, 2014, Defendant placed four calls to Assurance Wireless ("Assurance"), a subsidiary of Sprint, in which she misrepresented her identity by claiming to be a customer or another Assurance customer service employee, and attempted to obtain confidential information regarding accounts of customers with vanity numbers. Defendant's objection to Breithaupt's testimony that Defendant's purpose of the calls was to gain access to the accounts so that she could steal the numbers was sustained. (Doc. No. 150 at 72-76, 88-96.) Recordings and partial transcripts of the four

6

calls were entered into evidence, and Defendant stipulated that it was her voice on the recordings.  (Doc. Nos. 132 at 2; 150 at 90.)

In the first call, on March 5, 2014, Defendant claimed to be a customer and attempted to obtain security information about an Assurance account belonging to customer B.L.  (Doc. No. 150 at 87-92.)  Defendant did not succeed in obtaining the account's PIN number during the call, but according to Breithaupt, the account was later successfully accessed and its phone number ported away.  *Id.* at 88, 130.  Breithaupt testified that, based on his review of "Sprint's records," he believed Defendant was involved in the porting of that number.  *Id.*

The other three calls all took place on April 14, 2014.[3]  In the first of these calls, Defendant claimed to be a customer seeking to access the account of Assurance customer D.H., but was denied access to the account.  In the other calls, Defendant claimed to be an Assurance representative and attempted to obtain security information for the D.H. account.  (Doc. No. 150 at 103-13.)  Breithaupt testified that on the same date, he received a call from an AT&T representative who told him that Defendant was trying to port a number from AT&T to a "Sprint" account, which Breithaupt later ascertained was D.H.'s Assurance account.  *Id.* at 116-17.  The Court held that this testimony was not admissible for the truth of the matter asserted in the alleged AT&T call.[4]  Breithaupt

---

[3] Plaintiffs contend that four calls were made to Assurance by Defendant on this date, but only three were entered into evidence.  *See* Doc. No. 150 at 118.

[4] Sprint listed the AT&T representative as a witness at the hearing, but ultimately did not call her.

7

testified that the ports failed on April 14, 2014; his testimony is conflicted as to whether D.H.'s number was successfully ported at a later date.[5] During cross-examination, Breithaupt explained that Sprint had four affiliates, referred to by him variangly as "divisions," "brands," or "subsidiaries" – Assurance, Boost, Virgin Mobile, and Sprint Postpaid. (Doc. No. 227 at 63-64.) He admitted that Assurance is marketed under its own name and maintains a separate website. *Id*. at 24-25.

Breithaupt also testified regarding 18 unauthorized port requests to move vanity numbers from another telecommunications provider, Level 3 Communications, to Sprint's Boost Mobile ("Boost") subsidiary or its Virgin Mobile subsidiary, between July and October 2014. The parties stipulated to the existence of 13 of these ports to Boost. (Doc. No. 132 at 2.) Breithaupt testified that the 18 ports all originated from the Boost.com or VirginMobile.com websites by means of requests made outside of normal business hours. (Doc. No. 227 at 44.) The accounts created for these ports were listed under the names of Ruben Savin or Bruno Marks. (Doc. Nos. 150 at 140-142; 226 at 8-12.) Breithaupt admitted that there was no way to know for certain who was responsible for these ports, as Sprint does not record the IP addresses of individuals accessing Boost or Virgin Mobile prepaid accounts online. (Doc. No. 227 at 46-50.) However, Breithaupt testified that in his opinion, Defendant was responsible for these ports, based

---

[5] During direct examination, Breithaupt stated that the port request was later completed on April 21, 2014. (Doc. No. 150 at 83-85, 111.) However, upon cross-examination, Breithaupt responded that neither the port-in attempt, nor the port-out attempt, was ever completed. (Doc. No. 227 at 25-26.)

on "a couple of hallmarks" of Defendant, namely, using the same name on multiple accounts, targeting vanity numbers with repeating digits, and operating outside of normal business hours. (Doc. Nos. 150 at 141-42; 226 at 11-18, 84; 227 at 56-57, 71.) Breithaupt admitted that only circumstantial evidence linked Defendant to the porting activities he monitored. He testified that this in itself suggested that Defendant was the culprit, because she was careful to avoid detection. (Doc. No. 226 at 83-85.)

Finally, Breithaupt admitted that he had not identified any unauthorized attempts by Defendant to port numbers to or from Sprint since November 2014 (when the contempt hearing began), but that he believes that her actions have continued undetected. *Id*. at 12-16.

While on the stand, Defendant chose to invoke her Fifth Amendment privilege with respect to the vast majority of questions she was asked, but she did choose to answer some questions. She stated that she found the injunction entered against her in this case to be "confusing." (Doc. No. 227 at 95). Also, when questioned by Plaintiffs' counsel about the March 5, 2014 call to Assurance, in response to a question seeking to confirm that the Assurance representative gave Defendant the PIN number to customer B.N.'s account, Defendant testified that it would have been against Sprint's policy for the Assurance representative to have given her a PIN number over the phone. Defendant claimed that she knew the policies because she read them on Sprint's website. However, she then stated that the policies might be different as applied to Assurance. *Id.* at 144-45.

9

**Arguments of the Parties**

In its post-hearing brief, Sprint argues that the record, including Defendant's statements in Court documents and in live testimony, establish that she had notice of the Permanent Injunction before March 5, 2014. Sprint argues that its failure to list all of Sprint's various brands, affiliates, and subsidiaries, i.e., Assurance and Boost, by name in the Permanent Injunction is "immaterial" and that listing them would have been "unwieldy." Sprint also argues that the record shows that Defendant knew that Assurance and Boost were affiliates of Sprint. Sprint contends that Defendant violated the injunction by her calls to Assurance customer service, made in March and April 2014. Though the calls were placed to Assurance, Sprint contends that the calls still violated the injunction referencing Sprint because Assurance is a Sprint brand, and because, in her response to Sprint's motion for order to show cause, Defendant admitted that she "made several calls to Sprint in March and April of 2014."

Further, Sprint contends that Defendant violated the injunction by attempting to port the 18 numbers to Boost and Virgin Mobile between July and October 2014. Sprint argues that although the ports were not done in Defendant's name, the numbers targeted, as well as "other hallmarks of [Defendant]'s conduct" make it clear that Defendant was responsible for these port attempts. Sprint claims that each of Defendant's violations of the injunction caused Sprint to incur damages for fraud investigation, customer service time, and the time of employees in Sprint's porting department to undo the damage caused to customer accounts.

Defendant contends that Sprint has not provided any evidence that prior to April 24, 2014, she knew that the Permanent Injunction had been entered against her. She argues that the record is clear that she, a pro se litigant, was "extremely confused" about the injunction. She also argues that she cannot be held in contempt for making the Assurance calls because the Permanent Injunction does not clearly prohibit her from calling Assurance. Contrary to Sprint's position, Defendant urges that Sprint's failure to list Sprint's brands, affiliates, and subsidiaries in the Permanent Injunction "is most certainly a material omission." (Doc. No. 216.) She argues that there is insufficient evidence that she knew Assurance was a wholly-owned subsidiary of Sprint, or that she was responsible for porting the telephone numbers to Boost. Furthermore, Defendant maintains that like the situation with Assurance, she cannot be held in contempt for the Boost ports because the Permanent Injunction does not clearly prohibit her from porting numbers to Boost. Defendant argues that Sprint could easily have included Sprint's various brands, affiliates, and subsidiaries in defining "Sprint" in the injunction, as it did in another similar case, *Sprint Nextel v. EZCOM, Inc. d/b/a Tricom Communications*, 12-CV-0222 (C.D. Cal. 2012). Finally, Defendant argues that her alleged admission, quoted above, that she made calls to Sprint in March and April 2014, was simply a misstatement by Defendant's counsel, who was confused as to the precise nature of the calls. Defendant asks the Court not to construe this language as an admission on her part and penalize her for her attorney's mistake. (Doc. No. 216 at 8.)

11

**DISCUSSION**

District courts have inherent contempt power to enforce their orders. *Chicago Truck Drivers v. Bhd. Labor Leasing*, 207 F.3d 500, 504 (8th Cir. 2000). Civil contempt may properly be used as a sanction to enforce compliance with an order of the court and to compensate for damages sustained by reason of noncompliance. *Id.* at 505. "Contempt orders must be based upon a party's failure to comply with a clear and specific underlying order." *Int'l Bhd. of Elec. Workers, Local Union No. 545 v. Hope Elec. Corp.*, 293 F.3d 409, 418 (8th Cir. 2002). The party seeking civil contempt bears the burden of proving, by clear and convincing evidence, that there was a specific and definite order of the court; and that the alleged contemnor violated that order. *NLRB v. Constr. & Gen. Laborers' Union Local 1140*, 577 F.2d 16, 19 (8th Cir. 1978). To find a person in violation of a court injunction, "direct evidence is not required to sustain the . . . burden of showing actual notice [of the injunction] . . . for the reason that knowledge like any other fact, may be established by circumstantial evidence." *F.T.C. v. Neiswonger*, 494 F. Supp. 2d 1067, 1079 (E.D. Mo. 2007). "All that is required is knowledge of the mere existence of the injunction; not its precise terms." *Id.*

**Knowledge of the Permanent Injunction**

The Court first concludes that Sprint has met its burden of proving by clear and convincing evidence that Defendant had knowledge of the Court's October 25, 2013 Permanent Injunction by January 8, 2014. The Court rejects Defendant's argument that knowledge of the default judgment does not constitute knowledge of the Permanent

Injunction in this case where the two, *i.e.*, the default judgment and the Permanent Injunction, were contained in one document.[6]  Her statement on January 8, 2014, quoted above, in the context of a notice of intent to seek dismissal of the case, that she did not know a default judgment would be entered against her, suffices to establish that by January 8, she had actual knowledge of the default judgment and by extension, of the Permanent Injunction.

Further, Plaintiffs' motion for entry of final judgment (Doc. No. 24), filed on January 3, 2014, was styled and carried on the docket sheet as a "Motion for Default Judgment and Permanent Injunction against Defendant Jamie Yoak."  The certificate of service indicates it was mailed to Defendant at her residence address on January 3, 2014.  That motion and the related filings specifically reference the injunction entered by the Court, expressly identifying it as "Doc. 19" in the Court's record.  Plaintiffs' motion also specifically and clearly requested a hearing for Defendant to show cause why she should not be held in contempt for violation of the injunction.

Even if there were any material doubt of Defendant's knowledge by January 8, 2014, that an injunction had been entered – and there is not – there is no question that Defendant clearly knew of this Court's injunction no later than February 6, 2014, when she filed her pro se Motion to Dismiss Case for Failure to Serve.  (Doc. No. 28.)  In her motion, Defendant specifically references and responds to statements in Plaintiffs'

---

[6]  The Court notes that Plaintiffs' motion for default judgment and permanent injunction (Doc. Nos. 17 and 18), filed on October 4, 2013, describes and attaches the proposed injunction, and reflects service on Defendant.  The Clerk's Entry of Default was also mailed to Defendant.  *See* September 6, 2013 Clerk's entry.

Memorandum in Support of Motion for Default Judgment and Permanent Injunction (Doc. No. 18), filed on October 4, 2013. The terms of the proposed injunction were clearly discussed in Plaintiffs' motion and memorandum, and a copy of the proposed injunction was attached to Plaintiffs' memorandum. (Doc. No. 18-4). Defendant also responds to and quotes from Doc. No. 24 – Plaintiffs' motion for entry of final judgment – which, as set forth above, references both the fact and terms of the injunction entered by the Court.

It is also plain from Defendant's February 6 motion that she had access to and had reviewed the docket sheet, as she specifically references numerous filings, including her own, by docket number. The docket entry for this Court's entry of default judgment (Doc. No. 19) recites in detail the terms of the injunction that was entered.[7] Indeed, at page 17 of her February 6 motion, Defendant recites the fact that nine days after an entry on the attorneys' billing log of October 16, 2103, the "order for a permanent injunction was ordered by the court." (Doc. No. 28, at 15.) Thus, Defendant's statements that she was unaware of the fact and terms of the injunction until the Court handed it to her on April 24, 2014 are plainly and unequivocally refuted by the record.

The Court also rejects Defendant's suggestion that she was "confused" by the injunction. From her many dealings with the Court in this case, the Court finds Defendant to be a highly intelligent person, who pays extremely close attention to details.

---

[7] Defendant at times also asserts that she was confused regarding whether this action was separate from the suit previously filed by T-Mobile. But it is also clear from her memorandum that Defendant was well aware, at least by this time, that the suit filed by Sprint was different from the suit previously filed by T-Mobile by the same attorneys.

Based on the record, the Court finds that Sprint has established by clear and convincing evidence that Defendant was aware of the fact that an injunction had been entered against her no later than January 8, 2014, and was aware of the terms of the injunction in early January, and certainly no later than February 6, 2014.

**Was the Permanent Injunction Violated?**

The Court concludes that neither the Assurance calls, nor the 18 Boost.com and VirginMobile.com port attempts, violated the terms of the Permanent Injunction, as the language of the Injunction did not state, in a "specific and definite" manner, that Sprint's affiliates and subsidiaries were included. The Court rejects Sprint's argument that the statement in Defendant's August 25, 2014 response to Sprint's motion for contempt sanctions that Defendant "made several calls to Sprint in March and April of 2014" is an admission that Defendant understood her calls to Assurance to be in violation of the Injunction. The Court agrees with Defendant that this statement, rather, reflected the confusion of Defendant's counsel regarding the nature of the four calls, and will not hold Defendant responsible for her attorney's statement.[8]

Sprint's reliance on *United States v. Purgh*, 479 F.2d 611 (8th Cir. 1973), is unavailing. In *Purgh*, the Eighth Circuit affirmed a finding of criminal contempt where a licensed stock broker purchased unregistered securities, something explicitly forbidden by the injunction in that case, and claimed that he was unaware at the time of purchase

---

[8] Later in the hearing, defense counsel made plain that Defendant was admitting that the calls had been made by Defendant – thereby alleviating Plaintiffs of the need to prove the calls were from Defendant – but did not intend to admit that the calls were made to "Sprint."

that the securities were unregistered.  The court affirmed the finding that the broker's expertise as a stock trader belied his assertion that he was unaware of the nature of the stocks he bought, and that if he was uncertain he had a duty to determine whether the purchase would violate the injunction.  In contrast, here, it is the very terms of the Injunction which are at issue.  The Injunction contains no reference to subsidiaries of Sprint, much less identifies such subsidiaries, which would reasonably have put Defendant on notice that she was also forbidden from contacting these entities.   The Court rejects Sprint's arguments that this omission was immaterial, or that it would have been unwieldy to include the word "subsidiaries," and even to name them.

The Court reaches this conclusion even though the record, and specifically Defendant's testimony noted above that an Assurance representative giving her a PIN number over the phone would have violated Sprint's policies, provides some evidence that Defendant knew Assurance was an affiliate of Sprint.   But Plaintiffs did not establish by clear and convincing evidence that Defendant knew the relationship between Sprint on the one hand, and Assurance, Boost or Virgin Mobile, on the other, at the time the calls were made.

Based on the evidence presented, the Court has no trouble finding that through her telephone calls in March and April, 2014, Defendant was attempting fraudulently to gain unauthorized access to and cause alteration of customer account information.  And had these four telephone calls been made to a Sprint representative, the Court would likewise have no trouble finding that Plaintiffs met their burden to demonstrate a violation of this

Court's Injunction. Because affiliates and subsidiaries of Sprint were not included in the Injunction, however, neither Defendant's calls to Assurance, nor her alleged 18 port attempts to Boost and Virgin Mobile, violated the terms of the Injunction. Defendant has cited no cases to the contrary, nor has the Court found any.

Moreover, the Court notes that, with respect to the 18 port attempts between July and October 2014, the evidence produced by Sprint that the responsible party was Defendant was not clear and convincing. Sprint's own witness admitted that vanity numbers were considered valuable by others, such that they would pay a premium for them. Thus, others persons could have an incentive to gain unlawful access to these numbers. Further, the witness admitted there was no conclusive proof that these attempts were carried out by Defendant; and that his belief that she was responsible was based on factors which bore the hallmark of Defendant's earlier conduct. In sum, the Court will deny Sprint's motion for sanctions for civil contempt against Defendant.

## **CONCLUSION**

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' motion for sanctions for civil contempt for violating the Court's injunction dated October 25, 2013, is **DENIED**. (Doc. No. 52.)

                                              _____
                                              AUDREY G. FLEISSIG
                                              UNITED STATES DISTRICT JUDGE

Dated this 18th day of August, 2015.